**Appeal No. 23-1210**

# In The United States Court of Appeals For The Federal Circuit

RKW KLERKS INC.,

—v.—

*Plaintiff-Appellant,*

UNITED STATES,

*Defendant-Appellee.*

Appeal from the United States Court of International Trade in
Court No. 20-00001, Chief Judge Mark A. Barnett

## BRIEF FOR DEFENDANT-APPELLEE, UNITED STATES

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. MCCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

ELISA S. SOLOMON
Trial Attorney
Civil Division, U.S. Dept. of Justice
Commercial Litigation Branch
26 Federal Plaza – Suite 346
New York, New York 10278
Tel. No. (212) 264-0583

*Attorneys for Defendant-Appellee*

*Of Counsel:*

FARIHA KABIR
Office of Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

# TABLE OF CONTENTS

INTRODUCTION ................................................................................. 1

ISSUES PRESENTED .......................................................................... 2

STATEMENT OF THE CASE ............................................................... 2

   I.  The Imported Merchandise ............................................................ 2

   II.  Procedural History ....................................................................... 5

   III. The Trial Court's Decision .......................................................... 6

      A. Heading 6005, HTSUS ........................................................ 7

      B. Heading 8433, HTSUS ........................................................ 8

      C. Heading 8436, HTSUS ...................................................... 10

SUMMARY OF ARGUMENT ............................................................ 11

ARGUMENT ..................................................................................... 12

   I.  Standard Of Review ................................................................... 12

   II.  The Legal Framework For Tariff Classification ......................... 13

   III. The Trial Court Correctly Classified The Netwraps As Warp Knit Fabrics Made Of Synthetic Fibers, Under Subheading 6005.39.00 ......................... 16

   IV. The Trial Court Correctly Rejected Classification Of The Netwraps As "Parts" Of "Harvesting Or Threshing Machinery" Under Heading 8433 ... 20

      A. The Netwraps Do Not Meet The Dictionary Definition Of Parts Because They Are Not Integral To The Function Of Round Balers ...... 21

      B. The Netwraps Do Not Satisfy The Court-Established Test For Parts .... 26

1.  The Court Has Established Several Tests To Determine Whether An Imported Product Is A Part............................................................ 26

2.  The Trial Court Correctly Applied This Court's Precedents To Determine That The Netwraps Are Not Parts Of Round Balers....... 31

V.  Even If The Court Determines That The Netwraps Meet The Definition Of Parts, They Are Still Properly Classified Under Heading 6005 ............ 39

A. Additional United States Rule Of Interpretation 1(c) Directs Classification Under Heading 6005 ....................................................... 39

B. Even If GRI 3(a) Applies, Which It Does Not, It Would Direct Classification Under Heading 6005 ....................................................... 44

VI. The Trial Court Correctly Rejected RKW's Alternative Classification Of The Netwraps As "Parts" Of Agricultural Machinery Under Heading 8436, HTSUS.............................................................................................. 48

CONCLUSION ..................................................................................................... 49

# TABLE OF AUTHORITIES

## Cases

*ABB, Inc. v. United States*,
421 F.3d 1274 (Fed. Cir. 2005) ........................................................ 31

*American Express v. United States*,
29 C.C.P.A. 87 (1941) .................................................................... 36

*Aves. In Leather, Inc. v. United States*,
423 F.3d 1326 (Fed. Cir. 2005) ........................................................ 13

*BASF Corp. v. United States*,
482 F.3d 1324 (Fed. Cir. 2007) ........................................................ 13

*Bauerhin Techs. Ltd. P'ship v. United States*,
110 F.3d 774 (Fed. Cir. 1997) ................................................... *passim*

*Baxter Healthcare Corp. of Puerto Rico v. United States*,
182 F.3d 1333 (Fed. Cir. 1999) .................................................. 30, 31

*Brother Int'l Corp. v. United States*,
248 F. Supp .2d 1224 (Ct. Int'l Tr. 2002) ............................. 37, 38, 39

*Carl Zeiss, Inc. v. United States*,
195 F.3d 1375 (Fed. Cir. 1999) .................................................. 14, 35

*Cummins Inc. v. United States*,
454 F.3d 1361 (Fed. Cir. 2006) ........................................................ 13

*Fujitsu Am., Inc. v. United States*,
342 F. Supp. 2d 1326 (Ct. Int'l Tr. 2004), *aff'd*,
422 F.3d 1364 (Fed. Cir. 2005) ........................................................ 41

*Geo WM. Rueff, Inc. v. United States*,
28 Cust. Ct. 84 (1952), *aff'd*,
*United States v. Geo. Wm. Rueff, Inc.*, 41 C.C.P.A. 95 (1953). ................ *passim*

*JVC Co. of Am. v. United States*,
    234 F.3d 1348 (Fed. Cir. 2000)............................................................ 45

*Kelly v. United States*,
    826 F.2d 1049 (Fed. Cir. 1987).......................................................... 19

*Kent Int'l, Inc. v. United States*,
    393 F. Supp. 3d 1218 (Ct. Int'l Trade 2019) ............................... 44, 45

*Link Snacks, Inc. v. United States*,
    742 F.3d 962 (Fed. Cir. 2014)............................................................ 13

*Lonza Inc. v. United States*,
    46 F.3d 1098 (Fed. Cir. 1995)............................................................ 14

*Marubeni Am. Corp. v. United States*,
    35 F.3d 530 (Fed. Cir. 1994).............................................................. 14

*Millenium Lumber Distr. Ltd. v. United States*,
    558 F.3d 1326 (Fed. Cir. 2009).......................................................... 13

*Mita Copystar Am. v. United States*,
    160 F.3d 710 (Fed. Cir. 1998)...................................................... *passim*

*Mita Copystar Am., Inc. v. United States*,
    966 F. Supp. 1245 (Ct. Int'l Trade 1997) ................................ 15, 25,36

*National Carloading Corp. v. United States*,
    53 C.C.P.A. 57 (1966) ........................................................................ 35

*Nat'l Advanced Sys. v. United States*,
    26 F.3d 1107 (Fed. Cir. 1994).............................................. 10, 13, 23

*Orlando Food Corp. v. United States*,
    140 F.3d 1437 (Fed. Cir. 1998)..................................................... 13, 49

*Pomeroy Collection, Ltd. v. United States*,
    783 F. Supp.2d 1257 (Ct. Int'l Trade 2011) ..................................... 31

*Schlumberger Tech. Corp. v. United States*,
   845 F.3d (Fed. Cir. 2017) .................................................................. 42

*Shamrock Bldg. Materials, Inc. v. United States*,
   Slip Op. 20-00074, __ F. Supp. 3d __ (Ct. Int'l Trade Mar. 13, 2023),
   *appeal docketed*, No. 23-1648 (Fed. Cir. Mar. 23, 2023) ........................... 47, 48

*Totes, Inc. v. United States*,
   69 F.3d 495 (Fed. Cir. 1995) .............................................................. 47

*United States v. Geo. Wm. Rueff, Inc.*,
   41 C.C.P.A. 95 (1953) ...................................................................... 10

*United States v. Menasche*,
   348 U.S. 528 (1955) ......................................................................... 19

*United States v. Pompeo*,
   43 C.C.P.A. 9 (1955) ................................................................. *passim*

*United States v. Willoughby Camera Stores, Inc.*,
   21 C.C.P.A. 322 (1933) ............................................................. *passim*

*Well Luck Co., Inc. v. United States*,
   887 F.3d 1106 (Fed. Cir. 2018) ........................................................... 49

*Wilbur-Ellis Co. v. United States*,
   26 C.C.P.A. 403 (1939) ............................................................. *passim*

## **Statutes**

19 U.S.C. §§ 3001–3011 (1988) ............................................................ 14

28 U.S.C. § 1581(a) ..................................................................... 5, 6

## Harmonized Tariff Schedule of the United States

Additional U.S. Rules of Interpretation Rule 1(c) ......................................... *passim*

General Rule of Interpretation 1 .................................................... *passim*

    Explanatory Note to GRI 1 ............................................................. 15

General Rule of Interpretation 3 ................................................... *passim*

    Explanatory Note IV to GRI Rule 3(a) .................................... 48, 49

General Rule of Interpretation 6 .................................................. 15, 29

Section XI

    Note (7) to Section XI.................................................................. 17, 19

    Note (8) to Section XI.................................................................. 17, 18

    Chapter 57.......................................................................................... 48

        Heading 5703......................................................................... 48

    Chapter 60 ....................................................................... 7, 17, 18, 45

        Heading 6005.................................................................. *passim*

        Subheading 6005.39.00 ................................................. *passim*

        Explanatory Note 60.05 at XI-6005-1 ............................ 7, 12, 17, 19, 46

    Chapter 60 ....................................................................................... 29

        Heading 6307......................................................................... 29

Section XIII

    Chapter 70......................................................................................... 48

Heading 7007 .................................................................................... 48

Section XVI

Chapter 84 ........................................................................................ 45

Heading 8433 ................................................................... *passim*

Subheading 8433.90.50 ........................................ 8, 11, 20, 46

Subheading 8433.90.50.25 .................................................. 47

Heading 8436 ................................................... 6, 10, 45, 50

Subheading 8436.99.00 .............................................. *passim*

Section XVII

Chapter 87 ........................................................................................ 48

Heading 8708 .................................................................................... 48

Section XX

Chapter 94 ........................................................................................ 29

Note 3(b) to Chapter 94 ............................................................... 29

Heading 9404 .................................................................................... 29

Subheading 9401.90.10 ........................................................... 29

## <u>Other Authorities</u>

Constituent, *Merriam-Webster.com Dictionary*, Merriam-Webster,
  https://www.merriam-webster.com/dictionary/constituent
  (last accessed April 6, 2023) ................................................................ 21

Machine, *Merriam-Webster.com Dictionary*, Merriam-Webster,
  https://www.merriamwebster.com/dictionary/machine
  (last accessed April 6, 2023) ................................................................ 21

Machinery, *Merriam-Webster.com Dictionary*, Merriam-Webster,
  https://www.merriam-webster.com/dictionary/machinery
  (last accessed April 6, 2023). ............................................................... 21

Part, *Merriam-Webster.com Dictionary*, Merriam-Webster,
  https://www.merriam-webster.com/dictionary/part
  (last accessed April 6, 2023) ......................................................... 21, 26

Warp Knit*, Merriam-Webster.com Dictionary*, Merriam-Webster,
  https://www.merriam-webster.com/dictionary/warp% 20knit
  (last accessed April 6, 2023) ................................................................ 16

## STATEMENT PURSUANT TO RULE 47.5

In accordance with Rule 47.5 of the Rules of the United States Court of Appeals for the Federal Circuit, counsel for appellee makes the following statements:

1)    There are no other appeals arising from the decision of the Court of International Trade that is the subject of this action now pending before this Court or any other court of appeals.

2)    Counsel for Defendant-Appellee is not aware of any cases pending in this Court or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal.

## **INTRODUCTION**

This case involves the classification of two products that are used to wrap and protect round bales of harvested crops. These products, one marketed as "Top Net" and the other as "Rondotex" (together, the "Netwraps"), are imported by Appellant, RKW Klerks, Inc. ("RKW"). The trial court classified the merchandise under subheading 6005.39.00 of the Harmonized Tariff Schedule of the United States (HTSUS), which describes "warp knit fabrics" made of other synthetic fibers. This holding is consistent with the determination made by U.S. Customs Border Protection (CBP) during the administrative proceedings for the merchandise.

RKW does not dispute that the Netwraps are manufactured of warp knit fabrics made of synthetic fibers, and that the plain meaning of the terms of subheading 6005.39.00 describe the merchandise. Rather, RKW principally argues that the merchandise also qualifies as "parts" of harvesting or threshing machinery under subheading 8433.90.50, HTSUS, or alternatively, as "parts" of other agricultural machinery under subheading 8436.99.00, HTSUS, and that among the various provisions under consideration, one of the "parts" provisions should prevail.

The trial court rejected RKW's proposed classifications, holding that the merchandise does not meet the legal criteria for "parts" in HTSUS headings 8433

or 8436.  This Court should affirm the trial court's judgment because the

undisputed facts show that the imported Netwraps consist of warp knit fabrics

made of synthetic fibers, and the trial court committed no legal error in interpreting

the tariff term "parts," as that term is defined by dictionaries and the legal

standards set by this Court.  For these reasons, and those discussed below, the

judgment of the trial court should be affirmed.

## ISSUES PRESENTED

1)    Whether the United States Court of International Trade correctly held

that the Netwraps are properly classified as "warp knit fabrics" made of other

synthetic fibers, as provided for under subheading 6005.39.00, HTSUS.

2)    Whether the United States Court of International Trade correctly

interpreted the term "parts" in declining to classify the Netwraps as "parts" of

harvesting or threshing machinery under subheading 8433.90.50, HTSUS, or

alternatively, as "parts" of other agricultural machinery under subheading

8436.99.00, HTSUS.

## STATEMENT OF THE CASE

### I.    The Imported Merchandise

Netwraps are manufactured in Germany by several entities and plants owned

by RKW, which imports the Netwraps into the United States.  *See* Appx003–004

(citing Appx044 (Def.'s SOF ¶¶ 10, 11), Appx049 (Pl.'s SOF Resp. ¶¶ 10, 11)).

RKW is a subsidiary of RKW SE, a film producer that manufactures nonwoven

fabrics and nettings, including shrink bottle wrap, pallet stretch hoods, gardening and greenhouse films, trash bags, and other packaging solutions, as well as raw materials. Appx003 (citing Appx044 (Def.'s SOF ¶ 9), Appx049 (Pl.'s SOF Resp. ¶ 9)). Neither RKW SE nor any of its subsidiaries sell or produce machinery, including round balers or other harvesting equipment. Appx004 (citing Appx044 (Def.'s SOF ¶ 10), Appx049 (Pl.'s SOF Resp. ¶ 10)).

Both Top Net and Rondotex are comprised of the same materials and are manufactured in the same two-step process. *See* Appx004 (citing Appx043 (Def.'s SOF ¶ 5), Appx048 (Pl.'s SOF Resp. ¶ 5)). First, film layers are produced, one for chains and one for connecting threads. *See* Appx004 (citing Appx045 (Def.'s SOF ¶¶ 15, 17), Appx049 (Pl.'s SOF Resp. ¶¶ 15, 17)). The film layers are then cut into strips, stretched, heated, elongated, and knitted in Raschel machines, a type of knitting machine specifically designed for making Netwraps. *Id.* These layers of film are made up of high-density polyethylene, a synthetic resin that is exclusively used to manufacture Netwraps. Appx004 (citing Appx045 (Def.'s SOF ¶ 16), Appx049 (Pl.'s SOF Resp. ¶ 16)).

The Netwraps function to bind and secure crops in round bales. Appx004 (citing Appx044 (Def.'s SOF ¶ 8), Appx049 (Pl.'s SOF Resp. ¶ 8)). Round balers collect harvested crops, cut the crops into pieces, compact the pieces, and form the crops into bales. Appx004 (citing Appx046 (Def.'s SOF ¶ 21), Appx049 (Pl.'s

SOF Resp. ¶ 21)).  After compressing the crops into bales, round balers can wrap the bales with the Netwraps.  Appx004–005 (citing Appx046 (Def.'s SOF ¶ 22), Appx049 (Pl.'s SOF Resp. ¶ 22)).  RKW developed the Netwraps as a substitute for baler twine for use in round balers.  Appx004 (citing Appx046 (Def.'s SOF ¶ 23), Appx049 (Pl.'s SOF Resp. ¶ 23)).  Some round balers can use either net wrap or twine to wrap bales.  Appx005 (citing Appx046 (Def.'s SOF ¶ 24), Appx049 (Pl.'s SOF Resp. ¶ 24)).

Netwraps are wound on a roll, placed inside a compartment in the round baler, and held in place by claws or a metal bar.  *See* Appx018–019 (citing Appx044–045 (Def.'s SOF ¶ 14; Appx049 (Pl.'s SOF Resp. ¶ 14)).[1]  The Top Net and Rondotex products appear as follows:



---

[1] *See also* Appx044 (Def.'s SOF ¶ 13) (describing that Netwraps are sold to customers on a cardboard tube with a hollow core, like a thicker and more robust paper towel roll)); Appx049 (Pl.'s SOF Resp. ¶ 13).



Appx060–061 (Top Net image), Appx064 (Rondotex image).  We also filed a

motion with the Court to transmit samples of the Rondotex and Top Net products

to the Court as physical exhibits.  *See* ECF No. 32.

## II.    **Procedural History**

RKW entered the Netwraps in question as a single entry, Entry

No. 322-1912652-5, at the Port of Charleston, South Carolina on August 15, 2018.

Appx005.  CBP classified the Netwraps under HTSUS subheading 6005.39.00,

subject to a ten percent *ad valorem* duty, and liquidated the entry on July 12, 2019.

*Id.*  RKW filed a protest on November 12, 2019, which was denied by operation of

law on December 12, 2019, because CBP had not responded to the protest.  *Id.*

RKW timely filed this action pursuant to 28 U.S.C. § 1581(a).  Appx002.

After completing discovery, the parties cross-moved for summary judgment with

RKW moving for classification of the Netwraps under HTSUS subheading

8433.90.50, or, alternatively, under HTSUS subheading 8436.99.00, and the

Government moving for classification of the Netwraps under subheading

6005.39.00, HTSUS.  *Id.*  The trial court issued its opinion and entered judgment in

5

favor of the Government on October 4, 2022.  Appx026.  RKW filed its notice of appeal on November 28, 2022.  *Id.*

## III.   **The Trial Court's Decision**

In support of its decision as to the proper classification of the Netwraps, the trial court first ascertained the undisputed material facts.  Appx003–005.  Next, the trial court stated that classification typically involves a two-step process, however, "[w]hen no factual dispute exists regarding the merchandise, resolution of the classification turns solely on the first step."  Appx005–006.  In this step, the trial court "must determine the meaning of the relevant tariff provisions[.]"  Appx005.

The trial court interpreted the meaning of the tariff terms for headings 6005, 8433, and 8436, HTSUS.  Appx008–019.  Relying on the General Rules of Interpretation (GRI) of the HTSUS, precedent from this Court, and the Explanatory Notes to HTSUS heading 6005, the trial court determined that the Netwraps are classifiable as "Warp knit fabrics" under HTSUS heading 6005 but are not classifiable as "parts" under either HTSUS heading 8433 or HTSUS heading 8436.  Appx011, Appx014–019.

### A.   **Heading 6005, HTSUS**

The trial court first considered subheading 6005.39.00, HTSUS, in which CBP had liquidated the imported goods.  Chapter 60 covers "knitted or crocheted fabrics" and subheading 6005.39.00 provides as follows:

> **6005:** Warp knit fabrics (including those made on galloon knitting machines), other than those of headings 6001 to 6004:
>
> **6005.39** Of synthetic fibers:
>
> **6005.39.00** Other, printed

*See* Appx009; 6005.39.00, HTSUS (2018).

The trial court noted that the parties do not dispute that the Netwraps are covered by the plain language of HTSUS subheading 6005.39.00.  However, the trial court reviewed this classification *de novo* and interpreted the term "warp knit" using dictionary definitions and in accordance with the Explanatory Note to HTSUS heading 6005, which provides that the heading covers fabrics "'made on warp knitting machines (especially Raschel machines).'"  Appx010–011 (citing Explanatory Note 60.05 at XI-6005-1).  The trial court noted that RKW's corporate designee confirmed that the Netwraps possess the characteristics needed to be properly classified as "warp knit fabrics[,]" namely that the Netwraps were knitted on Raschel machines, are made of chains of knit fabric running in a lengthwise direction, and are made of synthetic fibers.  Appx011.  The trial court therefore

concluded that the Netwraps are classifiable under HTSUS subheading

6005.39.00.[2]  Appx011.

## B.    Heading 8433, HTSUS

Next the trial court considered RKW's primary claim that the Netwraps

should be classified as parts of harvesting or threshing machinery under HTSUS

subheading 8433.90.50, which provides as follows:

> **8433**: Harvesting or threshing machinery, including straw
> or fodder balers; grass or hay mowers; machines for
> cleaning, sorting or grading eggs, fruit or other
> agricultural produce, other than machinery of heading
> 8437; parts thereof:
>
> **8433.90** Parts:
>
> **8433.90.50** Other

*See* Appx008; 8433.90.50, HTSUS (2018).

In construing the term "parts" in subheading 8433.90.50, the trial court

identified two tests for determining whether merchandise may be classified as a

"part" of another article.  Appx0012.  The trial court described that the first test

---

[2] The trial court noted that, although HTSUS subheading 6005.39.00 also includes the term "[o]ther, printed[,]" neither party conducted discovery with respect to this issue and neither party identified evidence contrary to CBP's selection of the subheading 6005.39.00.  The trial court found that marketing materials contained references to roll-end markings and edge markings on the Netwraps, which were sufficient for classifying the Netwraps under subheading 6005.39.00 over the four other subheadings covering warp knit fabrics made of synthetic fibers under subheading 6005.39.  *See* Appx011 n.8.

considers whether the merchandise at issue "is claimed to be a part of another article that 'could not function as such article' without the claimed part." Appx012 (citing *United States v. Willoughby Camera Stores, Inc.*, 21 C.C.P.A. 322, 324 (1933); *Bauerhin Techs. Ltd. P'ship v. United States*, 110 F.3d 774, 778 (Fed. Cir. 1997)).  And the second test "by which merchandise may qualify as a part of another article is used when the claimed part, at the time of importation, is 'dedicated solely for use' in such article." Appx012 (citing *United States v. Pompeo*, 43 C.C.P.A. 9, 14 (1955)).

The trial court first considered whether the Netwraps are "dedicated solely for use" with the round balers.  The trial court observed that the parties did not dispute this issue and determined that the Netwraps are designed specifically for use in round balers.  Appx014 (citing Appx212 (Deposition of Stefan Kwiatkista 77:4–11 ("Kwiatkista Dep."); Appx056 (Aff. of Warren Schmeckpeper ¶ 21).

The trial court then considered whether "the Netwraps are an 'integral, constituent, or component part, without which' round hay balers 'could not function[.]'" Appx014 (citing *Pompeo*, 43 C.C.P.A. at 14; *Bauerhin*, 110 F.3d at 778).  The trial court observed that prior decisions had determined that bale twine used to bind bales of hay were not parts of baling machines for the purposes of tariff classification, as the twine was not an integral part of hay balers.

Appx014–015 (citing *Wilbur-Ellis Co. v. United States*, 26 C.C.P.A. 403, 406

(1939); *Geo WM. Rueff, Inc. v. United States*, 28 Cust. Ct. 84, 89–90 (1952), *aff'd*,

*United States v. Geo. Wm. Rueff, Inc.*, 41 C.C.P.A. 95 (1953)).

Turning to the undisputed facts in this case, the trial court observed that the

Netwraps function to maintain the shape of the bale after it has been compressed

and released from the round balers, which is distinct from the function of the round

bailers.  Appx015 (citing Appx218 (Kwiatkista Dep. 98:25–99:3)).  The trial court

also observed that some round balers are generally designed to use either Netwraps

or twine, which suggests that the round balers can function to compress crops into

bales and secure the bales even without the Netwraps.  Appx015 (citing Appx046

(Def.'s SOF ¶ 24); Appx049 (Pl.'s SOF Resp. ¶ 24)).  The trial court also noted

that the Netwraps "are disposable and do not remain with the hay balers after they

are wrapped around the bales of hay."  Appx016 (citing Appx217 (Kwiatkista

Dep. 95:21–25, 96:14–25, 97:2–14)).  The trial court concluded that the Netwraps

are not parts of harvesting of threshing machinery as the Netwraps are not integral

to the functioning of round balers.  *See* Appx015.

## C.    Heading 8436, HTSUS

Lastly, the trial court analyzed HTSUS subheading 8436.99.00, which

provides as follows:

> **8436**: Other agricultural, horticultural, forestry, poultry-
> keeping or bee-keeping machinery, including

germination plant fitted with mechanical or thermal
equipment; poultry incubators and brooders; parts
thereof:

**8436.99** Parts:

**8436.99.00** Other

Appx009; 8436.99.00, HTSUS (2018).  The trial court found that Netwraps are not

classifiable under HTSUS subheading 8436.99.00, as parts of other agricultural

machinery, for the same reasons that the trial court found that the Netwraps are not

classifiable under HTSUS subheading 8433.90.50.  Appx019.  Specifically, the

trial court determined that the Netwraps are not integral to the primary function of

agricultural machinery, the Netwraps do not remain affixed to the machinery, and

the Netwraps have a distinct function from that of the machinery with which they

are used.  Appx019.

## SUMMARY OF ARGUMENT

The trial court's judgment should be affirmed because the trial court did not

err in interpreting the tariff term "parts," and declining to classifying the

merchandise as "parts" of harvesting or threshing machinery under subheading

8433.90.50, HTSUS, or alternatively, as "parts" of other agricultural machinery

under subheading 8436.99.00, HTSUS.  And the trial court correctly determined

that the undisputed facts show that the imported Netwraps consist of warp knit

fabrics made of synthetic fibers.

First, RKW does not dispute that the Netwraps consist of warp knit fabrics

and are therefore covered by the plain language of heading 6005, HTSUS, which covers "[w]arp knit fabrics[.]"  This classification is further supported by the Explanatory Notes to heading 6005, which provide that "[w]arp knit fabrics . . . [are] made on warp knitting machines (especially Raschel machines)[,]" as the Netwraps are made on Raschel machines.

Second, in declining to classify the merchandise as "parts" of harvesting or threshing machinery or as parts of other agricultural machinery, the trial court properly determined that the Netwraps did not constitute "parts" by evaluating whether the Netwraps are integral to the functioning of round balers and whether the Netwraps have a distinct function than the round bailing machines.  The trial court's consideration of these factors is supported by the dictionary and the legal standards set by this, and other, Courts.

Therefore, the trial court's judgment should be affirmed.

## ARGUMENT

### I.     Standard Of Review

This Court reviews the trial court's grant of summary judgment "for correctness as a matter of law" and "decide[s] *de novo* the proper interpretation of the tariff provisions as well as whether there are genuine issues of fact to preclude summary judgment."  *Millenium Lumber Distr. Ltd. v. United States*, 558 F.3d 1326, 1328 (Fed. Cir. 2009).

## II.    The Legal Framework For Tariff Classification

Merchandise imported into the United States is classified under the provisions of the HTSUS.  It is well-established that the determination of whether a particular product falls within a tariff classification is a two-step process: first, the meaning of terms within the provision must be ascertained, and second, a determination must be made as to whether the merchandise at issue falls within the description of such terms as properly construed.  *See Nat'l Advanced Sys. v. United States*, 26 F.3d 1107, 1109 (Fed. Cir. 1994).  "[W]hen there is no dispute as to the nature of the merchandise, then the two-step classification analysis 'collapses entirely into a question of law.'"  *Link Snacks, Inc. v. United States*, 742 F.3d 962, 965–66 (Fed. Cir. 2014) (quoting *Cummins Inc. v. United States*, 454 F.3d 1361, 1363 (Fed. Cir. 2006)).

In applying this process, courts look to the six GRIs and the Additional United States Rules of Interpretation to construe and apply the HTSUS.  *See Orlando Food Corp. v. United States*, 140 F.3d 1437, 1439 (Fed. Cir. 1998); *BASF Corp. v. United States*, 482 F.3d 1324, 1325–26 (Fed. Cir. 2007).  The HTSUS section and chapter notes "are not optional interpretive rules," but instead have the force of statutory law.  *See Aves. In Leather, Inc. v. United States*, 423 F.3d 1326, 1333 (Fed. Cir. 2005) (citation omitted).  HTSUS terms are construed in accordance with their common and commercial meaning, which are presumed to

be the same. *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir.

1999). Further interpretive assistance may be provided in appropriate

circumstances by the Explanatory Notes published by the World Customs

Organization. *Marubeni Am. Corp. v. United State*s, 35 F.3d 530, 535 n.3 (Fed.

Cir. 1994).[3]

In classifying merchandise under the HTSUS, goods are first classified at the

four-digit heading level pursuant to GRI 1. GRI 1 provides, in relevant part, that

"for legal purposes, classification shall be determined according to the terms of the

headings and any relative section or chapter notes and, provided such headings or

notes do not otherwise require, according to the [remaining GRIs.]" The

Explanatory Note to GRI 1 states that "the terms of the headings and any relative

Section or Chapter Notes are paramount, *i.e.*, they are the first consideration in

---

[3] In the Omnibus Trade and Competitiveness Act of 1988, §§ 1201–1217,
Congress passed legislation implementing the Harmonized Commodity
Description and Coding System, the foundation of the HTSUS up to the six-digit
coding level. *See* 19 U.S.C. §§ 3001–3011 (1988). "The Explanatory Notes were
drafted subsequent to the preparation of the Harmonized System nomenclature"
and "[a]lthough generally indicative of proper interpretation of the various
provisions, the Explanatory Notes are not legally binding and are to be consulted
for guidance but not treated as dispositive." *Carl Zeiss*, 195 F.3d at 1378 n.1
(citing H.R. Rep. No. 100–576, 549 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547,
1582); *see also Lonza Inc. v. United States*, 46 F.3d 1098, 1109 (Fed. Cir. 1995)
("While the *Explanatory Notes* do not constitute controlling legislative history,
they do offer guidance in interpreting HTS subheadings.")

determining classification[.]"  World Customs Organization, Harmonized Commodity Description and Coding System: Explanatory Note GRI 1 (4th ed. 2007).  GRI 6 extends the principles of GRI 1 in selecting the appropriate classification at the six-digit subheading level.

The GRIs are applied in numerical order and the Court will turn to subsequent GRIs to determine the appropriate heading only if the proper classification of the imported goods cannot be accomplished by considering potential headings under GRI 1, *i.e.*, if there is more than one potential heading. *Mita Copystar Am. v. United States*, 160 F.3d 710, 712 (Fed. Cir. 1998).  GRI 3 provides a hierarchy of classifications where "goods are, prima facie, classifiable under two or more headings."  GRI 3(a) provides, in relevant part, that "the most specific description shall be preferred to headings providing a more general description[.]"

\* \* \*

As described in Section III below, the trial court correctly determined that the Netwraps are classifiable as warp knit fabrics under subheading 6005.39.00. We then describe in Section IV that the trial court's determination that the Netwraps should not be classified as "parts" of harvesting or threshing machinery under subheading 8433.90.50, HTSUS, should be affirmed.  Then in Section V, we describe that even if the Court determines that the Netwraps are *prima facie*

15

classifiable under both heading 8433, HTSUS, and heading 6005, HTSUS, that

classification under heading 6005 should prevail because the merchandise is more

specifically described in heading 6005.  Finally, in Section VI, we discuss that the

Netwraps are not classifiable as "parts" of other agricultural machinery under

subheading 8436.99.00, HTSUS, for the same reasons that the merchandise is not

classifiable under subheading 8433.90.50, HTSUS.

## III.    The Trial Court Correctly Classified The Netwraps As Warp Knit Fabrics Made Of Synthetic Fibers, Under Subheading 6005.39.00

The trial court's holding classifying the imported Netwraps under

subheading 6005.39.00 should be affirmed because it is consistent with the plain

meaning of the tariff statute and supported by the undisputed facts.

HTSUS heading 6005 covers, "Warp knit fabrics (including those made on

galloon knitting machines), other than those of headings 6001 to 6004.  Heading

6005, HTSUS (2018).  A "warp knit" is defined as a "knit fabric produced by

machine with the yarns running in a lengthwise direction."  Appx010 (citing

"Warp Knit", MERRIAM-WEBSTER.COM, https://www.merriam-

webster.com/dictionary/warp% 20knit (last accessed April 6, 2023).

The undisputed facts confirm that the Netwraps are classifiable as "warp knit

fabrics" under heading 6005.  As the trial court noted, there is no dispute "that the

Netwraps possess the characteristics needed to be properly classified as 'warp knit

fabrics[,]'" because the Netwraps consist of warp knit fabrics made of chains of

knit fabric running in a lengthwise direction.  Appx011.  In addition, while not controlling, the Explanatory Notes to HTSUS heading 6005 provide that the heading covers fabrics "made on warp knitting machines (especially Raschel machines)."  Explanatory Note 60.05 at XI-6005-1.  The parties stipulated that the Netwraps were knitted on Raschel machines.  *See* Appx004 (citing *See* Appx045 (Def.'s SOF ¶¶ 15, 17); Appx049 (Pl.'s SOF Resp. ¶¶ 15, 17).

Within Heading 6005, HTSUS subheading 6005.39.00 covers warp knit fabrics "of synthetic fibers . . . other, printed."  6005.39.00, HTSUS (2018).  The undisputed facts also make clear that the Netwraps are classifiable under HTSUS subheading 6005.39.00 because the Netwraps are comprised of synthetic materials.  *See* Appx004 (citing Appx045 (Def.'s SOF ¶ 16), Appx049 (Pl.'s SOF Resp. ¶ 16)).

The parties do not dispute that the Netwraps fall under the plain language of HTSUS heading 6005 and RKW did not argue that the Netwraps are not classifiable under heading 6005 before the trial court.  *See* Appx010 n.6.  Instead, RKW now argues, for the first time, that the Netwraps are not classifiable under heading 6005 pursuant to Notes (7) and (8) to HTSUS Section XI, which includes heading 6005 as part of Chapter 60.  Blue Br. 27–28.  Note 8(a) provides that "Chapter[] . . . 60 . . . do[es] not apply to goods made up within the meaning of note 7 above."  HTSUS Section XI, Note 8.  In turn, Note 7 defines the term "made

up" as follows:

> (a). Cut otherwise than into squares or rectangles;
> (b). Produced in the finished state, ready for use (or merely needing separation by cutting dividing threads) without sewing or other working (for example, certain dusters, towels, tablecloths, scarf squares, blankets);
> (c). Cut to size and with at least one heat-sealed edge with a visibly tapered or compressed border and the other edges treated as described in any other subparagraph of this note, but excluding fabrics the cut edges of which have been prevented from unraveling by hot cutting or by other simple means;
> (d). Hemmed or with rolled edges, or with a knotted fringe at any of the edges, but excluding fabrics, the cut edges of which have been prevented from unraveling by whipping or by other simple means;
> e). Cut to size and having undergone a process of drawn thread work;
> (f). Assembled by sewing, gumming or otherwise (other than piece goods consisting of two or more lengths of identical material joined end to end and piece goods composed of two or more textiles assembled in layers, whether or not padded); or
> (g).  Knitted or crocheted to shape, whether presented as separate items or in the form of a number of items in the length.

HTSUS Section XI, Note 7.  This definition makes clear that it does not apply to the Netwraps at issue.  None of the finishing processes identified in Note 7 apply or involve the imported Netwraps.  RKW asserts that the Netwraps are covered by Note 7(b), which defines the phrase "made up" to mean "[p]roduced in the finished state, ready for use . . .  without sewing or other working . . . ."  RKW asserts that the Netwraps are covered by Note 7(b) because they do not undergo further

processing upon importation. However, the Netwraps are not in a "finished state" within the meaning of Note 7(b). If the Netwraps are considered in a finished state because they are knitted and simply wound on a roll, then no merchandise would fall under Heading 6005 since the Explanatory Note to Heading 6005 instructs that merchandise falling under that heading is knitted on Raschel machines. *See* Explanatory Note 60.05 at XI-6005-1. And the examples in Note 7(b), "certain dusters, towels, tablecloths, scarf squares, blankets[,]" make clear that the note applies to finished products rather than the fabrics themselves. The Netwraps are a warp knit fabric, which is exactly what heading 6005 covers. RKW's interpretation of Note 7(b) would swallow heading 6005. *See Kelly v. United States*, 826 F.2d 1049, 1053 (Fed. Cir. 1987) ("The cardinal principle of statutory construction is to save and not to destroy. It is our duty to give effect, if possible, to every clause and word of a statute, rather than to emasculate an entire section[.]") (citing *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)). As such, the Court should not conclude that the Netwraps are in a "finished state" that would preclude them from classification under heading 6005.

RKW also argues that even if the Netwraps can be classified under heading 6005, classification of the Netwraps as parts of baling machine, or alternatively, as parts of agricultural machinery, should prevail. *See* Blue Br. 24–28. This argument fails because, as described below in Section IV, the Netwraps are not

classifiable as parts.  In addition, as described in Section V below, even if the Court determines that the Netwraps were parts of round balers, the Netwraps should still be classified under heading 6005, HTSUS, which more specifically describes the Netwraps.

## IV.   The Trial Court Correctly Rejected Classification Of The Netwraps As "Parts" Of "Harvesting Or Threshing Machinery" Under Heading 8433

Appellant claims that the trial court erred in determining that the Netwraps are not classifiable in HTSUS heading 8433, specifically under subheading 8433.90.50.  The relevant text of heading 8433 provides for "Harvesting or threshing machinery, including straw or fodder baler; . . . parts thereof[.]"  8433, HTSUS (2018).  Within that heading, subheading 8433.90.50 covers "Parts: Other."  8433.90.50, HTSUS (2018).

The trial court correctly declined this classification, holding that the merchandise does not meet the legal criteria for "parts."  The trial court's determination that the Netwraps did not satisfy the term "parts" should be affirmed as it is in accordance with the plain meaning of the term and the legal standards set by this, and other Courts, and the trial court did not err in applying the legal criteria for "parts" to the facts of the imported merchandise.

**A.     The Netwraps Do Not Meet The Dictionary Definition Of Parts Because They Are Not Integral To The Function Of Round Balers**

The trial court's holding that the Netwraps do not constitute "parts" of harvesting or threshing machinery under heading 8433 is consistent with the plain meaning of the term and should be affirmed.  Merriam-Webster dictionary, in relevant part, defines a "part" variably as "a constituent member of a machine or other apparatus" or as "an essential portion or integral element[.]"  *See* "Part." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/part (last accessed April 6, 2023).[4]  In turn, the dictionary defines "constituent" as "an essential part[.]"  *See* "Constituent."  *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/constituent (last accessed April 6, 2023).

Consistent with this definition, the trial court found "that the Netwraps are not integral to the functioning of round hay balers."  Appx015.  The trial court based this conclusion on the undisputed fact that the Netwraps function "to

---

[4] Machinery is defined, in relevant part, as "the working parts of a machine" and "machine" is in turn defined as "a mechanically, electrically, or electronically operated device for performing a task[.]"  *See* "Machinery." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/machinery (last accessed April 6, 2023); *See* "Machine." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriamwebster.com/dictionary/machine (last accessed April 6, 2023).

maintain the shape of the bale after it has been compressed and released from the baler[,]" a function distinct from that of round bailing machines, which is to compress crops into bales. *See* Appx015 (citing Appx218 (Kwiatkista Dep. 98:25–99:3)).[5] The trial court also observed that the Netwraps are not integral to the function of the round hay balers as these machines are generally designed to use both twine and Netwraps to secure bales in form. Appx015 (citing Appx046 (Def.'s SOF ¶ 24); Appx049 (Pl.'s SOF Resp. ¶ 24)). The trial court stated that the fact that Netwraps "may be the preferred method of wrapping bales is of no consequence" because "even without the Netwraps, round hay balers could compress crops into bales *and* secure the bales with alternative materials[.]" Appx015. Rather than a part, the trial court found that the Netwraps are an input, like hay or silage, into the round balers. Appx015.

The trial court did not err in applying the law to these undisputed facts to conclude that the Netwraps are not parts of round balers. The trial court's opinion is also consistent with prior decisions that have recognized that baler twine, a material used by some baling machines to secure bales, are not "parts" of baling

---

[5] *See also* Appx218 (Kwiatkista Dep. 98:18–24) ("Q: And the baler machine as you described before has mechanical function that compress and roll the product together, right, into the baler? A: Correct. Q And the wrap doesn't contribute to that function, right? A: No.").

machines.  In *Wilbur-Ellis*, the Federal Circuit's predecessor court, the United

States Court of Customs and Patents Appeals (CCPA), noted that:

> [B]inding twine is no more a part of a binder machine
> than thread is a part of a sewing machine.  While the
> thread passes through the machine in the process of
> sewing a garment, it merely passes through the machine
> and becomes a part of the machine's product[.]

*Wilbur-Ellis*, 26 C.C.P.A. at 406.  Just like thread is a product used by sewing

machines to sew materials together, the Netwraps are a product used by round

balers to bind bale crops.  And neither the Netwraps nor spools of thread are

machine parts.  Using a similar analogy, the trial court in *Geo WM. Rueff* rejected

the argument that baler twine was a part of an automatic hay-baling machine,

stating:

> [T]he function of a hay baler is to compress hay into the
> form of bales and to retain it in its compressed form until
> the bales have been securely tied in the manner
> hereinbefore set forth, and that the only function of bale
> ties is to hold the hay in its compressed form for storage
> and transportation purposes.  It is true that hay balers and
> bale ties are associated together in baling hay.  However,
> each performs its separate and independent function
> without the loss of any of its essential characteristics, and
> each retains its separate identity, name, character, and
> use.

28 Cust. Ct. at 90.  While both *Wilbur-Ellis* and *Geo WM. Rueff* involved different

products and earlier versions of the tariff classification system, the trial court

appropriately found the reasoning in those cases instructive.  Appx015.  These

cases recognize that an input temporarily placed in a machine for purposes of being applied to a different input does not satisfy the definition of "parts."

RKW attempts to distinguish *Wilbur-Ellis* and *Geo WM. Rueff* with the unsupported assertion that "the 1930s-vintage baling machines evaluated in *Wilbur-Ellis* did not attach the steel bale ties to the bales." Blue Br. 17. Even assuming that is true, the court reached a similar position in *Geo WM. Rueff*, where the twine at issue was placed into baling machines wrapped on a ball and the twine actually passed through the hay baling machine. *Id.*, 28 Cust. Ct. at 87–88. Likewise, the Netwraps at issue in this case are inserted into round balers wrapped on roll before the Netwrap is applied to the fully formed bales and released from the round balers. Appx016 (citing Appx217 (Kwiatkista Dep. 95:21–25, 96:14–25, 97:2–14)); Appx018–019 (citing Appx044–045 (Def.'s SOF ¶ 14), Appx049 (Pl.'s SOF Resp. SOF ¶ 14)); *see also* Appx044 (Def.'s SOF ¶ 13); Appx049 (Pl.'s SOF Resp. ¶ 13). The focus of the decisions in *Wilbur-Ellis* and *Geo WM. Rueff* is the instructive observation that twine applied to bales in a baling machine is like thread passing through a sewing machine – and neither the bailer twine, nor the thread is a part of these respective machines. RKW also tries to distinguish these cases on the basis that they were issued "under a significantly different earlier tariff law[,]" however this Court has rejected similar arguments by noting that there is nothing "to suggest that the term 'part' was meant to have a different definition under the

HTSUS than under its predecessor." *Mita Copystar Am*, 160 F.3d at 713.

RKW also asserts that the Netwraps are integral to the function of round balers "to produce bales that maintain their shape." Blue Br. 15–16. However, as described above, the undisputed facts show that the Netwraps are not integral to the function of the round balers because some round balers can interchangeably use net wrap *or* twine to wrap the bales. *See* Appx005 (citing Appx046 (Def.'s SOF ¶ 24); Appx049 (Pl.'s SOF Resp. ¶ 24)). As such, round hay balers could "could compress crops into bale form *and* secure the bales" without the use of the Netwraps. Appx015. RKW argues "[t]he principal way the baling machine performs" the function of securing the bales "is by wrapping the bales with netwrap" but that the use of twine to secure bales is "an alternative function of the machine[.]" Blue Br. 15. Appellant's attempt to distinguish binding bales with twine as an "alternative function" is unavailing. The fact that some round balers can secure hay bales using twine or Netwraps is an indication that neither twine nor Netwraps are integral to the function of the round balers. If a printer can print on either white or blue paper, the printer is not providing an "alternative function" if it prints on blue paper. Like the paper, the twine is an input into, but not a machine part. In addition, RKW cites no authority supporting its position that preference for a given input can transform that input into a machine part.

As such, the Netwraps do not satisfy the dictionary definition of the word "part" as they are not "an essential portion or integral element" nor are the Netwraps a "constituent member" of round balers.  *See* "Part." *Merriam-Webster.com Dictionary.*

**B.    The Netwraps Do Not Satisfy The Court-Established Test For Parts**

The trial court's holding, rejecting the classification of the merchandise as parts of certain machinery, should also be affirmed because the Netwraps do not meet the requirements for a "part" that have been established by this Court.

**1.   The Court Has Established Several Tests To Determine Whether An Imported Product Is A Part**

A number of decisions of the trial court, this Court, and its predecessor court have considered whether imported merchandise constitutes a part of another article.  In *Bauerhin Techs.*, the Court described in detail two prior cases concerning how to differentiate parts from other articles.  *Id.*, 110 F.3d at 779.  The Court described one test articulated in *Willoughby Camera*, a 1933 decision issued by the CCPA, which held that a tripod should not be classified as a part of a camera because the tripod was not "an integral, constituent, or component part, without which the article to which it is to be joined, could not function as such article."  *See Bauerhin*, 110 F.3d at 778 (citing *Willoughby Camera*, 21 C.C.P.A. at 324)).  The *Bauerhin* Court also identified a test articulated in *Pompeo*, a 1955

CCPA decision, which determined that an imported supercharger was a part of an automobile for classification purposes after finding that the supercharger was "'dedicated irrevocably for use upon automobiles[.]'" *See Bauerhin*, 110 F.3d at 779 (citing *Pompeo*, 43 C.C.P.A. at 13). Consistent with *Bauerhin*, the trial court evaluated the Netwraps in connection with the tests articulated in both *Pompeo* and *Willoughby Camera* and determined that the Netwraps were not parts of harvesting or other agricultural machinery.

RKW's challenge is largely premised on its position that *Bauerhin* established a disjunctive, rather than conjunctive, test for what constitutes a "part," *i.e.*, that imported merchandise can be considered a "part" of another article if it satisfied either of the tests articulated in *Pompeo* and *Willoughby Camera*. Blue Br. 11–12. As a result, RKW argues that the trial court "should have stopped . . . as soon as it determined that the imported netwrap is dedicated solely for use with baling machines." *Id.* at 13.

This argument is misguided. In *Bauerhin*, the Court did not analyze the merchandise according to the test articulated in *Pompeo* and stop there, as RKW suggests the trial court should have done in this case. Rather, *Bauerhin* discussed both of the tests articulated in *Pompeo* or *Willoughby Camera* as the parties disputed which test was applicable. The Court noted that each of these cases "discuss how to differentiate parts from other articles *under the particular facts*

*presented in each case.*" *Bauerhin*, 110 F.3d at 779 (emphasis added). And the Court directed that *Willoughby Camera* and *Pompeo* "are not inconsistent and *must be read together.*" *Id.* at 779 (emphasis added). Consistent with that direction, the Court evaluated the canopies in *Bauerhin* under *both* the test in *Willoughby Camera* and the test articulated in *Pompeo*.

At issue in *Bauerhin* was the appropriate classification of canopies that were designed and cut for car seats.[6] At the outset, the Court noted that "there is no specific provision for canopies[.]" *Id.* at 778. Instead, the government argued that the canopies should be classified in a basket provision under heading 6307, HTSUS, as "other made up textile articles." *Id.* The importer argued that the canopies were properly classified as "parts: of seats of a kind used for motor vehicles" under subheading 9401.90.10, HTSUS. *Id.* at 776. The Court "[r]econcil[ed] *Willoughby Camera* with *Pompeo*" and determined that in that case, where the canopy is "dedicated solely for use with another article *and* is not a

---

[6] The Court also considered the correct classification of cushion inserts for car seats and swings. The Court determined that the pad inserts were properly classified as "articles of bedding and similar furnishing" under heading 9404, HTSUS, pursuant to GRI 1 and GRI 6, rejecting an argument that the pad inserts should be classified under subheading 9401.90.10 covers "parts: of seats of a kind used for motor vehicles[.]" *Id.* at 776–77. However, the parties did not dispute that the inserts fell within the description of heading 9401. The Court's ultimate conclusion was based on Note 3(b) for Chapter 94, which is not relevant to this case.

separate and distinct commercial entity, *Pompeo* is closer precedent

and *Willoughby Camera* thus does not apply." *Id.* at 779 (emphasis added).  In

other words, the Court did not ignore the holding in *Willoughby Camera* but rather

determined that in that particular case, *Pompeo* was a closer precedent.  *Id.*

Neither *Pompeo* nor *Bauerhin* dismissed the test articulated in *Willoughby*

*Camera*, rather both of these decisions distinguished *Willoughby Camera*.  *See*

*Bauerhin*, 110 F.3d at 779; *Pompeo*, 43 C.C.P.A. at 14 ("Since the imported

superchargers at time of importation are dedicated solely for use upon automobiles,

as previously pointed out, and since when applied to that use they clearly meet the

definition of 'parts' established by the *Willoughby* case, we are of the opinion that

they were correctly classified as parts for automobiles").  Nor did *Bauerhin* adopt

the wholesale holding that imported merchandise is a part if it is "dedicated solely

for use with another article[,]" as RKW suggests.  Rather, the *Bauerhin* Court also

emphasized whether the imported merchandise is "a separate and distinct

commercial entity[,]" a consideration not discussed in *Pompeo* but articulated in

*Willoughby Camera*.  *See Willoughby Camera*, 21 C.C.P.A. at 325 (holding that

"cameras and tripods are separate and distinct commercial entities").

Subsequent opinions have, consistent with the analysis in *Bauerhin*,

continued to evaluate whether a good is a part by considering both tests described

in *Bauerhin* and have continued to apply *Willoughby*.  For example, in *Baxter*

*Healthcare Corp. of Puerto Rico v. United States*, 182 F.3d 1333 (Fed. Cir. 1999),

issued shortly after the decision in *Bauerhin*, the Court described that there are

"*two questions*" involved in determining whether imported merchandise is a "part"

of another article.  *Id.* at 1338 (emphasis added).  The Court elaborated, that "the

item must be dedicated solely or principally for use in those articles and must not

have substantial other independent commercial uses" adding that "'[i]f the item has

substantial other commercial uses, 'it is a distinct and separate commercial entity,'

not a part." *Baxter*, 182 F.3d at 1338–39 (citing *Bauerhin*, 110 F.3d at 779); *see*

*also ABB, Inc. v. United States*, 421 F.3d 1274, 1277 (Fed. Cir. 2005) ("[W]here an

article 'performs its separate function without loss of any of its essential

characteristics,' and, whether separate or joined, is 'complete in itself,' that article

is a 'distinct and separate commercial entity' and not a 'part.'") (citing *Willoughby*

*Camera*, 21 C.C.P.A. at 325) (quotation marks omitted in quoted source)).

Similarly, in *Pomeroy Collection, Ltd. v. United States*, 783 F. Supp. 2d 1257,

1261 (Ct. Int'l Trade 2011), cited by appellant, the trial court evaluated the

merchandise at issue under the test articulated in *Willoughby Camera*.  *See id.* at

1262 (determining that the imported merchandise was a part because it "satisfies

the *Willoughby* test.").

    These cases make clear that to classify imported merchandise as a part of

another article, a court will evaluate the tests articulated in both *Pompeo* and

*Willoughby Camera* based on the specific facts involved. As such, the trial court did not err in evaluating whether the Netwraps are "parts" under the tests articulated in both *Pompeo* and *Willoughby Camera*, as adopted by the Court in *Bauerhin—i.e.*, by considering whether the Netwraps are "dedicated solely for use" with the round balers and whether the Netwraps are an "integral, constituent, or component part[.]" *See* Appx014. And, as described below, the Court did not err in applying the tests articulated in *Pompeo* and *Willoughby Camera* to the undisputed facts in this case.

### 2. The Trial Court Correctly Applied This Court's Precedents To Determine That The Netwraps Are Not Parts Of Round Balers

The trial court did not err in holding that the Netwraps are not covered by the term "parts" under heading 8433 because the undisputed facts show that the Netwraps are "a separate and distinct commercial entity" from round balers and therefore are not a "part" of round balers according to the tests articulated in *Willoughby Camera* and *Bauerhin*. *See Bauerhin*, 110 F.3d at 779; *Willoughby Camera*, 21 C.C.P.A. at 325.

In determining that the Netwraps were not parts under the test articulated in *Willoughby Camera*, the trial court observed that Netwraps have a distinct function to keep crop bales in form *after* the round baling machine has already compressed the crops into a bale shape. *See* Appx015 (citing Appx218 (Kwiatkista Dep. 98:25–99:2–3)); *see also* Appx044 (Def.'s SOF ¶ 8); Appx049 (Pl.'s SOF Resp.

31

¶ 8).  By way of contrast, in *Bauerhin*, the Court stated that the canopies were not a separate and distinct commercial entity because the canopy "serves no function or purpose that is independent of the child safety seat."  *Bauerhin*, 110 F.3d at 779.

In addition, RKW manufactures the Netwraps but does not manufacture round balers or any other machinery, nor do other companies that manufacture baling machines also manufacture the Netwraps.  *See* Appx003–004 (citing Appx044 (Def.'s SOF ¶ 10); Appx049 (Pl.'s SOF Resp. ¶10)).  And RKW sells the Netwraps and does not sell round balers, *i.e.*, Netwraps and round balers are not sold together.  *See* Appx004 (citing Appx044 (Def.'s SOF ¶ 10); Appx049 (Pl.'s SOF Resp. ¶ 10)); *see also* Appx044 (Def.'s SOF ¶¶ 11, 13); Appx049 (Pl.'s SOF Resp. ¶¶ 11, 13); *compare Willoughby*, 21 C.C.P.A. at 323–24 ("It further appears from the record that cameras and tripods are rarely sold together[.]"), *with Bauerhin*, 110 F.3d at 779 (the canopies "are neither designed nor sold to be used independently.").

In addition, unlike the canopies at issue in *Bauerhin*, the Netwraps do not remain in the round balers during the entirety of their useful life.  As the trial court observed, the Netwraps are inserted into round balers wound on a roll and are applied to round bales after the round baler cuts crops into pieces, compacts the pieces, and form the pieces into bales.  *See* Appx004 (citing Appx046 (Def.'s SOF ¶ 21); Appx049 (Pl.'s SOF Resp. ¶ 21)); *see also* Appx016 (citing Appx218

(Kwiatkista Dep. 98:18–24)), Appx044 (Def.'s SOF ¶ 14); Appx049 (Pl.'s SOF Resp. ¶ 14)).  Once the Netwrap is applied to the bale, the Netwrap is released from the round baler machine along with the bale.  *See* Appx016–017 (citing Appx216–217 (Kwiatkista Dep. 90:1–91:14, 96:14–97:11)).[7]  In other words, the Netwraps are not permanently affixed into the round balers but are placed in the machines temporarily as the Netwrap roll is depleted.[8]

RKW asserts that "[t]he lower court's determination that the imported netwrap is dedicated solely for use with baling machines satisfies the language in *Bauerhin* stating that a claimed part 'is not a separate and distinct commercial entity.'"  Blue Br. 10 (citing *Bauerhin*, 110 F.3d at 779).  This argument is circular and attempts to collapse the two tests articulated in *Bauerhin* into one test.  In addition, this position ignores the undisputed facts summarized above, which indicate that the Netwraps are a distinct commercial entity from round balers.

---

[7] *See* Appx081 (Pl.'s Rog. Resp. ¶ 6) ("[T]he net wrap is wound around these products to produce a round bale which then ejects wrapped bale from the baling machine[.]")

[8] *See* Appx217 (Kwiatkista Dep. 96:14–25) ("Q: [O]nce all those bales are made, wrapped and ejected what's left of your product? A: The cardboard core.  It would be empty. Q: So just a cardboard core in the baling machine, right?  A:  In the baling machine, yes. Q: So just a tube of cardboard left?  A:  Yeah. Q:  What's done with that?  A:  That's normally taken by the farmer and put to trash or collectings, whatever.").

RKW also argues that the Netwraps are not a separate and distinct commercial entity because the Netwraps have "no other purpose, function, or commercial use except for being used with baling machines to wrap bales of hay." Blue Br. 13. However, RKW's arguments ignore that the Netwraps have a function distinct from that of the hay bailing machines, that is to maintain the shape of the bale after it has been compressed and released from the hay baling machine. Appx015 (citing Appx218 (Kwiatkista Dep. 98:25–99:3)).

RKW cites several cases that it argues support its position that the Netwraps are parts of round balers. However, these cases offer no support for the position that temporary inputs into a machine that serve their primary function after being released from the machine can be a part of that machine.

RKW cites *National Carloading Corp. v. United States*, 53 C.C.P.A. 57 (1966), which involved the classification of spark plugs. *See* Blue Br. 21. However, that case involved a question of classification as between two parts provisions — parts of internal combustion engines or parts of automobiles. *National* Carloading, 53 C.C.P.A. at 59. In addition, the spark plugs "serve an igniting function as parts of internal combustion engines" and therefore serve their primary function while inserted into the internal combustion engines. *Id.* at 61. This case has no bearing on the situation here, where an input into a machine is not permanently affixed into the machine and continues to function after being ejected

from the machine.

Next RKW cites *Mita Copystar Am.*, 160 F.3d at 711, in which the Court reviewed the classification of toner cartridges used in photocopiers and determined that the cartridges should be classified in a heading covering parts and accessories of photocopiers. Blue Br. 21. CBP had argued that the toner cartridges should be classified as chemical preparations for photographic uses. *Mita Copystar Am.*, 160 F.3d at 711. In reaching this holding, *Mita Copystar* distinguished *American Express v. United States,* 29 C.C.P.A. 87 (June 9, 1941), in which the CCPA held that film separators were not classifiable as "parts of a camera." *Id.* at 713. The Court explained that "[u]nlike typewriter paper, copier paper, or photographic film, toner is not ordinarily regarded as the material upon which the photocopy machine operates." *Id.* The Court also noted that "[t]he cartridges are sold with toner inside; they remain with the toner throughout its use by the photocopier; they are the standard device for providing toner to the photocopier; and they are not designed for reuse."[9] *Id.* at 712–13.

---

[9] This Court's opinion in *Mita Copystar* does not explicitly discuss the test for parts or the opinion issued in *Bauerhin*. However, the trial court opinion that was affirmed in that case described both *Willoughby Camera* and *Pompeo* and noted that *Bauerhin* "employed two prominent customs cases . . . as standards when it decided whether an article legally constitutes a 'part'" and that *Bauerhin* instructed that these cases be read together. *See Mita Copystar Am., Inc. v. United States*, 966 F. Supp. 1245, 1247 (Ct. Int'l Trade 1997) (citing *Bauerhin*, 110 F.3d at 779).

RKW also relies on *Brother Int'l Corp. v. United States*, 248 F. Supp. 2d 1224 (Ct. Int'l Tr. 2002), in which the trial court examined the classification of printer cartridges containing polyethylene terephthalate ("PET") film used in multifunction centers ("MFC") and facsimile machines. *Id.* at 1225; *see* Blue Br. 22–23. The importer argued that the printer cartridges should be classified as parts of those machines whereas the government argued that the merchandise should be classified under a heading covering photographic film in rolls. *Id.* at 1227–29. The trial court in that case concluded that the cartridge was properly classified as a part because "these machines cannot function in their intended capacity unless the [cartridge] is properly inserted, as they would lack the means to create a printed image[.]" *Id.* at 1229–30.

*Brother* and *Mita Copystar* both concerned similar merchandise and both are entirely distinguishable from the Netwraps at issue here. First and foremost, in neither case was there a specific HTSUS heading that directly described the merchandise in question, as heading 6005, HTSUS, does here. Additionally, both decisions noted several factors that do not apply here. In *Brother*, the Court noted that the plaintiff manufactured the cartridges and the relevant machines and that the cartridges were sold together with the machines. 248 F. Supp. 2d at 1229–30. In contrast, RKW does not produce round balers or any other machinery. *See* Appx004 (citing Appx044 (Def.'s SOF ¶ 10); Appx049 (Pl.'s SOF Resp. ¶ 10));

*see also* Appx044 (Def.'s SOF ¶ 11); Appx049 (Pl.'s SOF Resp. ¶ 11) (stating that RKW sells the Netwraps directly to wholesalers).

The trial court in this case correctly distinguished *Mita Copystar* and *Brother*. *See* Appx018 n.11. As the trial court described, the toner cartridges and printing cartridges at issue in those cases "stayed with the photocopiers and . . . machines for the entirely of their useful life—the cartridges were only disposed of once they became useless," whereas the Netwraps "perform their intended function—to hold the form of the bales—after the bales have left the baling machines." *See* Appx018 n.11. As the *Brother* Court noted, "[o]nce the PET film roll within the [cartridge] is used up, it is discarded; it has no intrinsic value or separate purpose" and that as a result, it was not classifiable as photographic film. *Brother*, 248 F. Supp. 2d at 1233. In contrast, the Netwraps have a continued purpose of keeping the compressed bales in round bales after the Netwrap has been removed from the round balers. *See* Appx015 (citing Appx218 (Kwiatkista Dep. 98:25–99:2–3)); *see also* Appx216–217 (Kwiatkista Dep. 91:19–25, 96:14–97:5). In addition, unlike toner and print cartridges, which are incorporated into the respective machines and have a mechanical function integral to the operation of those machines (*i.e.*, the machines could not print without these products), Netwraps do not have a function necessary to the balers' operation. Instead, the Netwraps are inserted into the balers temporarily for the sole purpose

of being wrapped around the crop bale once it has been molded into shape by a round baler, similar to the way paper is inserted into a typewriter so that text can be imprinted onto that paper.  As such, the trial court correctly determined that the Netwraps are not parts of a machine, but rather material upon which the round baler "is designed to operate."  *See Willoughby Camera*, 21 C.C.P.A. at 325.

RKW argues that "[t]he lower court did not take into consideration that the toner or the PET film in the cartridges continues to perform its function of creating an image on paper after the paper has left the copying machine, whereas the cardboard core on which the netwrap is wound remains in the baler and is disposed of once it is empty."  Blue Br. 22.  RKW's argument misconstrues the facts of these prior cases.  At issue in those cases was not a cup of ink, but rather the cartridges themselves.[10]  Unlikely the cartridges at issue in those cases, which were encased in plastic and metal containers that are fixed into compatible printers and become part of the functioning of those printers, the Netwraps at issue here are simply wrapped onto a disposable roll so that the Netwraps can be applied to wrap

---

[10] As the trial court noted, "[t]he products in *Mita Copystar* and *Brother* were classified in accordance with the functionality of the containers—delivery systems for the toner and PET film, respectively—and not by the substances contained within."  Appx018.  The trial court contrasted the Netwraps, which "are simply on rolls, placed inside a compartment located within the baler and held in place by claws or a metal bar which is otherwise attached to the machine."  Appx019–020.

around hay bales.

For the reasons described above, the Netwraps are a "separate and distinct commercial entity" from round balers, and therefore the trial court did not err in holding that the Netwraps do not qualify as "parts" of round balers.

## V.    **Even If The Court Determines That The Netwraps Meet The Definition Of Parts, They Are Still Properly Classified Under Heading 6005**

Even if the Court were to consider the imported merchandise to be *prima facie* classifiable in both heading 6005, HTSUS, and heading 8433, HTSUS, which as we show above, it should not, the Netwraps should still be classified under heading 6005, HTSUS, by operation of Additional United States Rules of Interpretation Rule 1(c) and GRI 3.

### A.    **Additional United States Rule Of Interpretation 1(c) Directs Classification Under Heading 6005**

The Netwraps are precluded from classification under heading 8433, HTSUS, by operation of Additional United States Rules of Interpretation, Rule 1(c).  Rule 1(c) provides, in relevant part:

> In the absence of special language or context which otherwise requires . . . a provision for parts of an article covers products solely or principally used as a part of such articles but a provision for 'parts' or 'parts and accessories' shall not prevail over a specific provision for such part or accessory.

Applying Rule 1(c) in this case, heading 6005, HTSUS, is a "specific provision" describing the article at issue, whereas heading 8433, HTSUS, is a

provision more generally covering the article at issue, *i.e.*, harvesting or threshing machinery, and "products solely or principally used as a part of such articles." Consequently, even if the Court were to determine that the Netwraps are parts of round balers, the Netwraps should still be classified under heading 6005 by application of Rule 1(c).

An instructive example of the application of Rule 1(c) is reflected in *Fujitsu Am., Inc. v. United States*, 342 F. Supp. 2d 1326 (Ct. Int'l Tr. 2004*), aff'd*, 422 F.3d 1364 (Fed. Cir. 2005). There, the Court considered whether a cooling component of an automatic data processing ("ADP") machine should be classified in a provision for "[m]achinery, plant or laboratory . . . involving a change of temperature" or under a provision describing "[p]arts and accessories" of ADP machines. *Id.* at 1338 n.5. The Court applied Rule 1(c) and held that the merchandise is properly classified under the machinery, plant, or laboratory provision. *Id.* Likewise, in this case, heading 6005, HTSUS, as the specific provision describing the article in question, should prevail over heading 8433, HTSUS, which covers parts of round balers and other harvesting equipment.

Plaintiff argues that heading 8433, HTSUS, should prevail over heading 6005, HTSUS, because under Rule 1(c), a provision for a part prevails over a basket provision. Blue Br. 28–29. However, heading 6005 is an *eo nomine* provision—not a basket provision. An *eo nomine* provision is one that "describes

the articles it covers by name." *Schlumberger Tech. Corp. v. United States*, 845 F.3d 29 1158, 1164 (Fed. Cir. 2017). Here, heading 6005, HTSUS, describes the relevant merchandise by a specific name, *i.e.*, "[w]arp knit fabrics," and is therefore an *eo nomine* provision.

RKW argues that heading 6005 is a basket or residual provision because it applies to warp knit fabrics "other than those" of preceding headings and because subheading 6005.39.00 applies to "other" printed warp knit fabrics of synthetic fibers. *See* Blue Br. 28–29. However, RKW's argument ignores that heading 6005 provides for a very specific type of fabrics, *i.e.*, warp knit fabrics, and the phrase "other than those of headings 6001 to 6004" in the heading clarifies that they are different from the fabrics of the preceding headings. Thus, the use of the word "other" in this context narrows the scope and makes heading 6005, HTSUS, a more (not less) specific provision.

In support of its argument that heading 8433, HTSUS, prevails over heading 6005, HTSUS, RKW relies on Note 2(b) to Section XVI (chapters 84 and 85). Blue Br. 24–25. Note 2(b) provides, in relevant part: "parts, if suitable for use solely or principally with a particular kind of machine, or with a number of machines of the same heading . . . are to be classified with the machines of that

kind . . . ."[11]  RKW argues that Note 2(b) constitutes "special language" within the meaning of Rule 1(c), and therefore, that Rule 1(c) does not govern in this case. However, RKW's argument assumes a conflict between Section Note 2(b) and Rule 1(c).  Rule 1(c) directs that "a provision for 'parts' or 'parts and accessories' shall not prevail over a specific provision for such part or accessory" whereas Section Note 2(b) speaks to whether parts of machines can be classified with the machines covered by the headings in that section.  Note 2(b) does not govern the *priority* of classification where merchandise is *prima facie* classifiable under two headings.  As such, Section Note 2(b) is not "special language" that trumps the application of Rule 1(c).

---

[11] The complete note provides:

> (b) Other parts, if suitable for use solely or principally with a particular kind of machine, or with a number of machines of the same heading (including a machine of heading 8479 or 8543) are to be classified with the machines of that kind or in heading 8409, 8431, 8448, 8466, 8473, 8503, 8522, 8529 or 8538 as appropriate. However, parts which are equally suitable for use principally with the goods of headings 8517 and 8525 to 8528 are to be classified in heading 8517, and parts which are suitable for use solely or principally with the goods of heading 8524 are to be classified in heading 8529.

Without explanation, RKW asserts that the decision in *Mita Copystar*, discussed above, stands for the proposition that "section note 2(b) to Section XVI prevails over Additional U.S. Rule of Interpretation 1(c)[.]" Blue Br. 26. However, *Mita Copystar* offers no discussion of Section Note 2(b) or Rule 1(c) or any analogous provisions. While *Mita Copystar* did determine that a similar note 2(b) to Chapter 90 dictated that the merchandise at issue should be classified as parts in subheading 9009.90.00, it did so pursuant to GRI 1, not GRI 3, because there was no heading at issue that specifically described the merchandise at issue. *Id.* at 712. As such, Rule 1(c), which provides that "a provision for "parts" or "parts and accessories" shall not prevail over a specific provision for such part or accessory" did not apply to that case.

Appellant also cites *Kent Int'l, Inc. v. United States*, 393 F. Supp. 3d 1218 (Ct. Int'l Trade 2019). However, in that case, the trial court agreed with the government that a note to HTSUS Chapter 94 precluded classification under one of the proposed headings and determined the appropriate classification pursuant to GRI 1. *Id.* at 1223–24. Here, heading 6005 undoubtedly describes the Netwraps. And, as described above, Notes (7) and (8) to HTSUS Section XI do not exclude the Netwraps from classification under heading 6005. As a result, even if the Court were to determine that the Netwraps are classifiable under both heading 6005 and heading 8433 (which they are not), the question presented is which

heading should prevail. And Rule 1(c) directs that classification under heading 6005 prevails over a provision for parts.

**B.    Even If GRI 3(a) Applies, Which It Does Not, It Would Direct Classification Under Heading 6005**

GRI 3(a) requires that the heading that "provides the most specific description shall be preferred to headings providing a more general description."[12] The first step in applying GRI 3(a), is for the Court to "determine which heading is most specific, comparing only the language of the headings[.]" *JVC Co. of Am. v. United States*, 234 F.3d 1348, 1352 (Fed. Cir. 2000) (citation omitted).

As described above in Section III, the Netwraps are explicitly described by the terms of heading 6005, HTSUS, which covers "[w]arp knit fabrics." The trial court noted that the parties do not dispute that the Netwraps are a type of warp knit. Appx010. As also described above, the Explanatory Notes to heading 6005,

---

[12] RKW has offered no argument in this appeal concerning GRI 3, although it did provide arguments concerning GRI 3 at the trial court. RKW's brief states generally that "RKW presented additional arguments in support of its position that the chapter 84 parts classification prevails over the chapter 60 fabric classification" and that RKW "reserves those arguments for its reply brief, if necessary, or for proceedings on remand to the lower court, if necessary." Blue Br. 29. RKW offers no reason why it has kept the government and the Court guessing concerning the nature of its arguments. In any event, the government has offered arguments concerning GRI 3 because that rule would apply if the Court were to determine that there is more than one potential heading.

HTSUS, further confirm that heading 6005 specifically describes the Netwraps. *See* Appx011.

Heading 8433, HTSUS, specifically identifies types of "[h]arvesting or threshing machinery and "balers" by name and subheading 8433.90.50 specifically provides for "parts: other" of those machines identified in heading 8433.  As such, heading 8433 is an *eo nomine* provision, as is subheading 8433.90.50.  However, heading 8433.90.50, HTSUS, more generally covers broad categories of "[h]arvesting or threshing machinery" and related parts.  This broad category of harvesting or threshing machinery and related parts offers no description of the specific merchandise at issue here, the Netwraps.

The opinion in *Totes, Inc. v. United States*, 69 F.3d 495 (Fed. Cir. 1995), is instructive.  The Court considered the proper classification of a trunk organizer and concluded that an *eo nomine* provision covering a wide range of bags and "similar containers" prevailed over a use provision for "parts and accessories of motor vehicles" because the provision for similar containers "more specifically describes the merchandise than the competing provision." *Id.* at 499.  As in *Totes*, the competing provisions in this case are "not equal." *Id.*  Heading 6005, HTSUS, is more specific than heading 8433, which is a broad provision including a wide range of articles that are used for harvesting or threshing, whereas heading 6005, HTSUS, only entails warp knit fabrics, particularly those made on Raschel

45

machines.  As such, heading 6005, HTSUS, is more specific in describing the merchandise than heading 8433, HTSUS.

Moreover, heading 6005, describes the subject merchandise by name, *i.e.*, warp knit fabrics, whereas the relevant language in heading 8433, HTSUS, describes an entire class of merchandise, *i.e.*, harvesting or threshing machinery, and parts thereof. [13] *See* Explanatory Note IV(a) to GRI 3(a) ("A description by name is more specific than a description by class (*e.g.*, shavers and hair clippers, with a self-contained electric motor, are classified in heading 85.10 and not in heading 84.67 as tools for working in the hand with self-contained electric motor or in heading 85.09 as electro-mechanical domestic appliances with self-contained electric motor).")

In addition, Explanatory Note IV(b) to GRI 3(a) provides the helpful guidance that, "[i]f the goods answer to a description which more clearly identifies them, that description is more specific than one where identification is less complete."  Explanatory Note IV(b) to GRI 3(a) provides two particularly

---

[13] Balers are identified in statistical subheading 8433.90.50.25, which covers "parts . . . [o]f haying machines and balers[.]"  However, the "ten-digit statistical subheadings are of no significance to the tariff treatment." *Shamrock Bldg. Materials, Inc. v. United States*, Slip Op. 20-00074, __ F. Supp. 3d __, at *8 n.7 (Ct. Int'l Trade Mar. 13, 2023), *appeal docketed*, No. 23-1648 (Fed. Cir. Mar. 23, 2023).

instructive examples.  First, the note directs that tufted textile carpets for use in motor cars should be classified in heading 5703, which covers carpets, rather than as accessories of motor cars in heading 8708.  *Id.*  Second, the note directs that "[u]nframed safety glass consisting of toughened or laminated glass, shaped and identifiable for use in aeroplanes" is more appropriately classified in heading 7007, "where it is more specifically described as safety glass[,]" rather than in a heading for parts in Chapter 88, which covers aircrafts, spacecrafts, and related parts.  *Id.*  Here, heading 6005 describes the Netwraps more completely.  Similar to the examples described in Explanatory Note IV(b)(1), heading 6005 specifically describes the Netwraps whereas harvesting or threshing machinery and related parts is a broad category, which could encompass a wide range of merchandise.  As such, heading 6005, HTSUS, is more specific in describing the Netwraps than heading 8433, HTSUS.

Finally, the rule of "relative specificity" described in *Orlando Food* also favors classification under heading 6005.  In *Orlando Food*, the Court looked for "the provision with requirements that are more difficult to satisfy and that describe the article with the greatest degree of accuracy and certainty."  *Id.*, 140 F.3d at 1441.  Here, heading 6005 is more difficult to satisfy because it describes a very specific type of knitted fabric produced in a specific manner, *i.e.,* on a Raschel machine, whereas the relevant language in heading 8433, HTSUS, broadly

encompasses harvesting or threshing machinery and parts thereof. *See, e.g.*, *Well Luck Co., Inc. v. United States*, 887 F.3d 1106, 1115 (Fed. Cir. 2018) (determining a provision that covered "[f]ruit, nuts and other edible parts of plants, otherwise prepared or preserved" was more difficult to satisfy than a provision covering "[s]unflower seeds" because the requirement that merchandise be "prepared or preserved" rendered it more difficult to satisfy.)

## VI.  The Trial Court Correctly Rejected RKW's Alternative Classification Of The Netwraps As "Parts" Of Agricultural Machinery Under Heading 8436, HTSUS

Appellant suggests, in the alternative, that if round balers are not properly classified under heading 8433, HTSUS, and by extension, that the Netwraps are not properly classified as parts of round balers under subheading 8433.90.50, then the Netwraps could be classified under heading 8436, HTSUS, as parts of "other agricultural . . . . machinery[.]"  Blue Br. 29–30.  The trial court appropriately rejected this argument as the Netwraps are not parts of round balers or any other agricultural machinery, as discussed above in Section IV.  The judgment of the trial court should be affirmed on this point as the Netwraps are not classifiable under heading 8436, HTSUS, for the same reasons articulated above with respect to heading 8433, HTSUS.

48

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court affirm the judgment

below.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

/s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
*Of Counsel*:                                   International Trade Field Office

Fariha Kabir                                   /s/ Elisa S. Solomon
Office of the Assistant Chief      ELISA S. SOLOMON
Counsel                                         Trial Attorney
International Trade Litigation    Department of Justice, Civil Division
U.S. Customs and Border Protection  Commercial Litigation Branch
26 Federal Plaza – Suite 346
New York, New York 10278
(212) 264-0583

*Attorneys for Defendant-Appellee*

Dated:  April 7, 2023
         New York, New York

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 7, 2023, Defendant-Appellee, United States, sent a copy of the foregoing brief to Jerry Wiskin, Esq., of the law firm of Simons & Wiskin, counsel for plaintiff-appellant, by email.  As described in the accompanying Consent Motion for Leave to File its Response Brief Out of Time, filed on April 10, 2023, Counsel for the Government sent the brief by email after encountering technical difficulties in filing the brief electronically.  Mr. Wiskin provided his consent to that motion.

I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

<u>/s/ Elisa S. Solomon</u>

Dated:  April 10, 2023
        New York, New York

## CERTIFICATE OF COMPLIANCE PURSUANT TO
## FEDERAL CIRCUIT RULE 32(b)(3)

I, Elisa S. Solomon, a trial attorney in the Office of the Assistant Attorney

General, Civil Division, Commercial Litigation Branch, International Trade Field

Office, who is responsible for the foregoing brief, relying upon the word count

feature of Microsoft Word, the word processing program used to prepare the brief,

certify that this brief complies with the type-volume limitation under Fed. R. App.

P. 32(a)(7)(B), and contains 11,888 words.


/s/ Elisa S. Solomon